IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

ASSOCIATION OF COMMUNITY            )
ORGANIZATIONS FOR REFORM            )
NOW et al.,                         )
                                    )
                                    )
            Plaintiffs,             )
                                    )
     v.                             )   Case No. 08-CV-4084-NKL
                                    )
DEBORAH E. SCOTT,                   )
et al.,                             )
                                    )
            Defendants.             )

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction [Doc. # 3]. The Court grants Plaintiffs' motion as to Defendants Scott and Luck and denies the motion as to all other Defendants.[1]

**I.    Findings of Fact**

**A.    Background**

Missouri's Department of Social Services ("DSS") is the state agency responsible

---

[1] At the hearing conducted on July 9, 2008, the Plaintiffs presented no evidence which indicated that the local election authorities were failing to comply with the national Voter Registration Act or related state laws. At the conclusion of the hearing, the Plaintiffs requested the Court to order the local election authorities to notify local DSS offices if voter registration forms were defective in any way. (Tr. 246). Plaintiffs, however, did not present proof that the local election authorities had not been doing this. Plaintiffs therefore failed to establish the need for a preliminary injunction against the local election authorities.

1

for administering several public assistance programs including federal Food Stamps, Medicaid, rehabilitation programs for the blind, MO HealthNet, and the TANF income assistance program. Each local office of the DSS that administers these programs is a voter registration agency required to comply with Section 7 of the National Voter Registration Act of 1993 ("NVRA"). 42 U.S.C. § 1973gg-5(a)(2)(a), 1973gg-5(a)(4)(a). Defendant Deborah Scott ("Scott) is the Director of DSS. Defendant Janel R. Luck ("Luck") is the Director of the Missouri's Family Support Division ("FSD"). FSD is the Division of DSS that is responsible for the DSS programs listed above, including responsibilities for providing voter registration under the NVRA.

On August 23, 2007, Plaintiff Association of Community Organizations for Reform Now ("ACORN") sent a letter to Missouri Secretary of State Robin Carnahan ("Carnahan") and Deborah E. Scott ("Scott"). The letter alleged that DSS was in violation of Section 7 of the National Voter Registration Act for failing to provide certain voter registration materials and services to public assistance clients in Missouri. (Compl. Ex. A). On October 11, 2007, Scott responded to ACORN's letter attributing declining registration numbers in Missouri's public agencies to increased use of on-line services. (Compl. Ex. B).

In February, 2006, Plaintiff Dionne O'Neal ("O'Neal") visited a DSS office to re-certify for public assistance benefits. (Tr. 56). On that and other occasions, O'Neal claims that no one from DSS asked if she was registered to vote or if she wanted to apply to register to vote; she was not given any document that asked if she was registered to

2

vote, whether she needed to update her voter registration for her current address, or whether she would like to apply to register to vote at the DSS office on that day. (Tr. 56-58). On February 2006 and each prior occasion, neither the DSS employee who assisted her nor any other DSS employee offered to give her a voter registration application. *Id.*

### B. Procedural History

On April 23, 2008, ACORN and O'Neal filed a complaint contemporaneously with its Motion for Preliminary Injunction against Scott, Luck and the Jackson County, Kansas City and St. Louis City Boards of Election Commissioners. ACORN and O'Neal allege that these local election authorities have failed to fulfill their obligations under NVRA and Missouri-implementing statutes to "instruct and direct" deputy registration officials and mandated state agencies like DSS in their duties. Mo. Rev. Stat. § 115.145.2. They also allege that DSS is in violation of the NVRA. ACORN and O'Neal seek declaratory and injunctive relief to secure DSS's compliance with the NVRA. (Compl. ¶ 56). The Court held an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction on July 9, 2008, after denying all Defendants' motions to dismiss on July 7, 2008.[2]

### C. Findings of Fact

Plaintiff ACORN is a not-for-profit organization, incorporated in Arkansas with Missouri-based offices in Kansas City and St. Louis. ACORN is active on behalf of the

---

[2] One day was required to hear all the testimonial evidence. The Plaintiffs withdrew their motion for preliminary injunction as to "remote" services offered by DSS.

interests of low and moderate-income families including efforts to obtain housing, voting and wage rights. Individual ACORN members have not been offered the opportunity to register to vote by DSS. (Ordower Dep. 45-46). Because of DSS's failure to offer registration services, ACORN is spending significant resources on voter registration services, including voter registration outside of DSS offices, instead of on its other activities. (Ordower Dep. 94-95).

Plaintiff Dionne O'Neal, a St. Louis resident and DSS client, has visited a DSS office two times in the last five years. (Tr. 57). O'Neal was not offered voter registration services during those two visits. *Id.* O'Neal moved to her new address in February, 2008. As a result, O'Neal must file a change-of-address form with the St. Louis City Board of Election Commissioners before she can vote.[3]

DSS's written policy regarding voter registration is contained at Section 0105.026.00 of its Income Maintenance Manual, which is available on the Department's website, www.dss.mo.gov/fsd/iman. The policy states the following:

> Voter registration services must be made available to *all* public assistance applicants and recipients. This includes all members who could register to vote in a household. Voter registration services are to be made available *at in-person interviews* (including home visits) for:
>
> 1. application for any IM program;
>
> 2. recertifications;

---

[3]At the hearing, the local election authorities indicated that O'Neal could vote on the day of the election at her new precinct but she would first have to fill out a change of address form at the time she appeared to vote.

4

3. reinvestigations; and

4. a change of address report.

NOTE: Offer to send Voter Registration forms with the applicant or recipient for other individuals listed in the household who may want to register to vote but are not physically present in the office. (DSS IM Manual 0105.026.00 Voter Registration Requirements).[4]

The Missouri Secretary of State provides voter registration forms used by public assistance agencies, such as DSS. Mo. Rev. Stat. §§ 115.136, 115.162(1). The forms for public assistance agencies have a voter registration application on the front and a declination form on the back. (Ex. B). As required by Section 7 of the NVRA, public assistance agencies must distribute a voter registration form offering the recipient the opportunity to register to vote, with each application, recertification, or change of address related to benefits services. 42 USC 1973gg-5(a)(6)(A)(B). While eligibility specialists must offer each in-person interviewee this form, non-case workers must provide the form only if requested. (Tr. 72). The detachable "declination" form on the reverse side of the voter registration form constitutes documented proof of whether a client was offered voter registration services.

---

[4] In 1995, the agency's voter registration policy "wasn't put in any particular section of the manual at that time. If it was ever in the food stamps manual, it was probably added once they moved to the online-type of manual." (Bentley Dep. 43). The reference was not included in the manual until sometime in 2004, when DSS placed its manuals on an intra-agency online system. (Bentley Dep. 46). In that same year, 2004, the reference to voter registration services was removed from the Food Stamp manual's list of forms to be provided during an interview; the reference was removed pursuant to a memorandum written by Morris. (Morris Dep. 75-76). It was not returned to the manual until sometime in April 2008. So from 1995, when the NVRA first took effect, until sometime in 2004, no manual – paper or electronic – contained a reference to voter registration services.

Sections 0105.026.05 and 0105.026.10 of DSS's Income and Maintenance Manual (IM) set forth the precise interview procedure and the procedure for those who decline voter services. These IM sections state that the eligibility specialist should have the client answer the question of whether they would like to register to vote, sign the declination if the answer is no, and if the client declines to mark either the "yes" or "no" box, to "record on the form the individual's name, the fact that they declined voter registration services, the date, and the worker's signature." (Tr.72). As a result, one voter registration form should be used for every in-person interview. Clients who want to register to vote will check the "yes" box on the declination and complete the voter registration. Clients who do not want to register will check the "no" box on the declination and sign their name. If the client keeps the form blank, the case worker is supposed to record information on the declination indicating that the client declined voter registration.

DSS's Income Maintenance manual requires an eligibility specialist to retain a declination form in the client's case file for two years only if the client declines to register to vote. If the client chooses to register, the entire voter registration application form – which includes the declination – is supposed to be sent to the local election authority. Even though the declination is detachable from the rest of the application, eligibility specialists are instructed, by DSS policy, not to detach it from the application. (*See* 0105.026.05.05, Interview Procedures, IM manual). Therefore, when a client chooses to register, the agency does not have the detached declination form and does not have an accurate accounting of who has, or has not, been offered the service.

During the week of May 7, 2007, Nyana Miller, a staff member of ACORN, conducted DSS offices surveys in St. Louis City, St. Louis County, Jackson County and Clay County to determine whether they were providing voter registration services, as required by the NVRA.[5] (Tr. 36). Miller conducted "secret shopper" office visits to determine the availability of voter registration applications, signs and the readiness of the staff to offer voter registration services. (Tr. 37-38). She also surveyed DSS clients leaving DSS offices to determine whether the client was offered voter registration services during his or her visit. (Tr. 38-39). When Miller visited offices, she identified herself as a person interested in applying for food stamps and took contemporaneous notes. (Tr. 38-39).

Miller's office visit surveys show that 3 of the 11 DSS offices she visited had no voter registration applications available. (Doc. 97 Ex. 31). Her survey of DSS clients who met with an eligibility specialist in person showed that only three were offered the opportunity to register to vote during their visit with the agency. (Tr. 49-50).[6]

---

[5] Both DSS and Plaintiffs raised hearsay objections during the hearing. As this was a hearing on a preliminary injunction, "procedures . . . are less formal and evidence . . . is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 396 (1981); *Bebe Stores, Inc. v. May Dep't Stores Int'l, Inc.*, 230 F. Supp. 2d 980 n.4 (E.D. Mo. Oct. 21, 2002) (permitting hearsay affidavits in preliminary injunction hearing).

[6] While Ms. Miller's surveys were not scientifically conducted, the state demographer admitted that the survey was an effective tool to determine whether voter registration was occurring on the specific days Ms. Miller visited those specific offices.

7

Independent data confirm Ms. Miller's findings. While the number of voter registration applications received from DSS and DHSS offices declined from 143,134 in 1995-1996 to 15,568 in 2005-2006, the average monthly number of households receiving Food Stamps through applications at DSS has increased from 238,699 households in fiscal year 1995 to 300,498 households in fiscal year 2006. See FSD, Annual Data Report Fiscal Year 1999, available at http://www.dss.mo.gov/re/pdf/fsd/fsd1999.pdf.

Rachel Morris, Assistant Deputy Director of FSD for food stamps, EBT and quality control confirmed that each public-assistance recipient must personally enter a local office at some point after submitting an application or recertification requests. (Morris Dep. 32). Indeed, DSS's Food Stamps policy requires each client to come into the office every 12 months, unless a particular person obtains a hardship waiver. (Tr. 75).[7] It is not "uncommon" for DSS eligibility specialists to extend hardship waivers, but DSS does not know how many waivers it extends for in-person interviews.[8] (Tr. 78). Assuming half of all applications received by DSS are actually bi-annual re-certifications, in which the applicant is not required to come into the office, DSS received 1,631,266 applications in which the client was required to come into the office between July 1, 2003

---

[7] A DSS client may obtain a waiver if they are elderly, disabled, lack transportation or an in-person interview would interfere with his or her job. (Tr. 75).

[8] DSS does not review the number of hardship waivers offered because it is not reviewed by federal regulators. (Tr. 79). DSS does not even keep track of the number of hardships given.

8

and April 30, 2008.[9] Food Stamps recipients must reapply every 6 months. (Morris Dep. 30). Because a DSS employee must provide a voter registration form to each client applying, recertifying, or changing his or her address related to a benefit, the number of voter registration forms DSS orders should be equal to the number of public-assistance clients covered by the NVRA-mandated transactions. As explained below, DSS did not possess the number of forms needed for NVRA compliance.

Since 2005, Robert Hall has served as the agency contact between DSS and the Missouri Secretary of State. (Tr. 81). Hall's duties include ordering voter registration forms for DSS offices. *Id*. It takes approximately four to six weeks for DSS to receive an order of voter registration forms. (Tr. 86). Hall has four jobs at DSS, devoting only 20% of his time to voter registration duties. (Tr. 90). Hall does not monitor the voter registration form needs of DSS local offices, nor NVRA compliance, he only receives and forwards emails between DSS local offices and the Secretary of State's office. (Tr. 93, 95-96). From January 2003 to April 2008, the Secretary of State ordered 620,000 public assistance agency forms, which includes forms not only to be used by DSS but also by the Department of Health and Senior Services ("DHSS"). Thus, between March 30, 2003 and April 2008, a total of 620,000 voter registration forms were printed for use in both

---

[9] Plaintiffs admit they have no concrete evidence that half of the approximately 3.2 million applications DSS receives require an in-person interview because DSS was totally unable to provide any information related to the number of in-person interviews. This fact, standing alone, provides evidence that DSS lacks adequate monitoring of NVRA compliance. (Tr. 9). Moreover, since the mandated rule is that there must be in person applications, it would be unexpected that more than half of those applicants were given hardship excuses. It is therefore reasonable to conclude that at least half of the required in person contacts did occur.

9

DSS and DHSS offices. As DSS does not obtain forms from any other source, it did not order any more than 620,000 voter registration forms during this time frame. Yet, by a reasonable estimate, it needed approximately 1.5 million forms.

DSS internal investigations have also concluded that it is failing to comply with the NVRA. In April 2004, DSS conducted its own internal survey of some local offices to determine how they were performing with regards to offering voter registration services. In "How Counties are Handling Voter Registration," a 21-county DSS survey on the local offices' performance conducted in April 2004, Linda Haus found that only 11 of 21 offices "routinely" provided the service, with the remaining 10 offices faring worse. (Tr. 214-216). Five of those 10 remaining offices provided registration services only "sporadically" and one did not provide it at all. *Id*. After this survey, DSS took no corrective action except to send out another notice that DSS employees should comply with the NVRA.

On December 6, 2007, Pamela Burrell, FSE (Food Stamp Eligibility) Program Manager at the Greene County FSD office, emailed Rachel Morris asking her how the Greene County office can "stay in compliance" with the NVRA, noting that the office was "completely out of [voter registration] forms." (Doc. 97 Ex. 41). On February 28, 2008, Debra Jones, Southwest Region Field Liaison, emailed Robert Hall asking for "at least 500" voter registration forms for the Greene County office because they were "having a real problem keeping them in the office." (Doc. 97 Ex. 47). On March 6, 2008, Sharon Vestal sent an email to Debra Jones, Southwest Region Field Liaison,

informing her that Webster and Wright Counties have had voter registration applications on back order since January 2008 and "unless we can get some forms from other counties or until the warehouse receives their order, we will not be able to register people to vote." (Doc. 97 Ex. 42). Hall admits the warehouse was without forms between December 2007 and mid-March 2008. (Hall Dep. 112).

On October 24, 2007, Kathy Metcalfe-Davis sent an email to Jane Claas informing her that "there are completed voter registration cards at Randl's desk that are dated back to October, 2006" – a year earlier. (Doc. 97 Ex. 38). Claas responded that the forms are supposed to be mailed to the county clerks offices at the end of each week and that these forms, in particular, had to be forwarded to the clerk. She added, "I know you mentioned to me that they came to pick them [the forms] up and I had said that they needed to be mailed last year when the National Voter Registration booklet was received." *Id*. Metcalfe-Davis responded, "I don't know if they should be mailed in at this point. I don't know what else we would do with them but since we got that email a few months ago about a lawsuit filed because we were not handling them properly I would think we could get in trouble for not mailing them in after this long. Since it has been a year and there have been several elections that people thought they registered have missed out on, I think it would not be looked at lightly . . . ." *Id*. DSS introduced no evidence to show that these voter registration forms were ever filed with the local election authority.

Antoinette Briguglio-Mays, an eligibility supervisor of eight years, admits that the Chouteau office has no procedure in place to assess whether eligibility specialists are

11

complying with the requirement to provide voter registration services. (Mays Dep., 42). However, based on her experience, only a "majority" of eligibility specialists offer voter registration forms. (Tr. 196-198). "I would say that I have not seen a pattern that [voter registration forms] were not offered . . . majority means to me that I can't say specifically a percentage, but as a supervisor for eight years, I would say that more than 80 percent have been . . . correct in the voter registration." (Tr. 197).

Supervisors will sometimes review checklists rather than conduct case reviews. Mays says the six eligibility specialists under her supervision use an "interview observation checklist" on which one checks off each service/form provided to a client during the interview. A few such completed checklists, all dated sometime in 2007, do not contain the phrase "voter registration services" printed; rather they simply contain "other" boxes, next to which lines have been printed for the eligibility specialist to write in an additional item. (Ex. 4).

While DSS has established that it provided NVRA training and that its policy is to comply with the NVRA, and two outstanding employees testified about their efforts to comply with the NVRA (TR. 156-158), the record clearly establishes that DSS employees have not fully complied with the NVRA. Even the testimony of DSS employees confirmed significant lapses in NVRA compliance. This has occurred because DSS lacks the internal controls that would produce comprehensive compliance.

The front line of DSS's NVRA compliance is composed of DSS eligibility specialists, who are supervised by eligibility supervisors who are in turn supervised by

12

eligibility program managers. While an eligibility specialist meets with a client, he or she completes all benefits applications on an intranet system, FAMIS. On a separate screen within that system – called EUMEMROL – an eligibility specialist can enter additional notes. There is no policy requiring eligibility specialists to enter comments in EUMEMROL on the FAMIS system. (Denney Dep. 17; Morris Dep. 113). Local practices differ. For example, in the Chouteau office, there is an "expectation" that eligibility specialists will enter comments on voter registration on EUMEMROL, but no system or screen exists on which one can check to see if the specialist provided the service. (Tr. 158). Even if an eligibility specialist does enter comments in EUMEMROL, there is no way to track it on FAMIS, as the system does not allow one to generate reports to show whether eligibility specialists have offered voter registration services. (Denney Dep. 16-17). If no declination exists in the folder, and no notation is made in EUMEMROL, it is possible that a voter application was (a) completed and sent, (b) completed but not sent, (c) or never offered. Moreover, a supervisor will not find in the file a declination – which serves as the best proof the service was offered – if the eligibility specialist's client registered, because under DSS policy the eligibility specialist must submit the entire form, which includes both application and declination, to the local election authority. Without locating a declination, the supervisor cannot be certain the service was offered. No policy instructs an eligibility specialist to maintain a photocopy of the declination form in the file. (Denney, 18-19). The evidence demonstrated that local offices fail to keep tallies of declinations (Moody Dep. 42), and fail to keep track of

13

when registration services are offered. (Darcy Dep.; Mays Dep. 32-33). Most significantly, there is no corrective action taken if a case review identifies a failure to provide registration services. (Tr. 66).

Because there is no effective way to determine whether DSS employees are complying with the NVRA and there is no consequence for failure to comply, it is not surprising that there have been lapses in DSS compliance with the NVRA.

## II. Conclusions of Law

### A. NVRA

In 1993, Congress enacted the National Voter Registration Act ("NVRA"). 42 U.S.C. § 1973gg-2 to § 1973gg-9. The NVRA provides, in relevant part, that each state must designate all offices in the state that provide public assistance as voter registration agencies. These public assistance agencies must: (1) distribute voter registration applications to applicants; (2) offer applicants assistance in completing the forms unless the applicants refuse such assistance; and (3) accept completed forms for transmittal to the appropriate state election official. 42 U.S.C. § 1973gg-5(a)(4)(A). Voter registration applications must be distributed with each application for public assistance and/or disability services and with each re-certification, renewal, or change-of-address relating to such service or assistance unless the applicant, in writing, declines to register to vote. 42 U.S.C. § 1973gg-5(a)(6)(A). Section 115.136.7 of the Missouri statutes specifically provides that, "[a]ny person who is aggrieved by a violation of the National Voter Registration Act may provide written notice of the violation to the secretary of state and

14

may bring a civil action pursuant to the process prescribed by section 11 of the National Voter Registration Act of 1993."

### B. Standing

DSS challenges ACORN's standing to bring this action because ACORN lacks a concrete injury sufficient to confer standing. According to DSS, ACORN has already established its budget for voter registration, therefore it is not forced to divert resources; and, ACORN does not plan to conduct any voter registration drives in 2009.

An association satisfies the Article III standing requirements to sue in its own right when it meets the same standing test applicable to individuals. *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.* 342 F.3d 871, 881 (8th Cir. 2003) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)). In order to meet Article III standing requirements, a plaintiff must show that it has suffered an injury or the imminent threat thereof; that the injury is "fairly traceable" to the defendant's actions; and that the injury or threat thereof is likely redressable by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

ACORN's suit is not, as DSS alleges, only in pursuit of the abstract goal of increasing minority voter registration. ACORN has presented evidence that members, including but not limited to Dionne O'Neal, have been denied the opportunity to register to vote because DSS does not offer the service. (Ordower Dep. 45-46). The State of Missouri has failed to provide voter registration opportunities at the offices of public service agencies as required by the NVRA and Missouri law. (Compl. ¶ 6). That failure

15

has caused harm to numerous ACORN members by denying them opportunities to register to vote. Where the injury to a member of an organization is germane to its purpose, that organization has standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("In contrast, the affidavits and testimony . . . and the affiant members' reasonable concerns about the effects of [environmental pollution], directly affected those affiants' recreational, aesthetic, and economic interests."). Even if the Court only analyzed ACORN's standing on the basis that it had to devote scarce resources to litigation instead of other voter registration activities, it has been resolved that "counteracting the effects of [a state's] alleged failure to implement 42 U.S.C. § 1973gg-5(4)(A), as here, suffices to confer standing. *ACORN v. Fowler*, 178 F.3d 350, 360-61 (5th Cir. 1999).

While DSS is correct that the only obstacle to O'Neal's voting is filing a change of address form with the St. Louis Board of Election Commissioners, the explicit purpose of the NVRA was to reduce barriers to voting, especially for disadvantaged groups of which O'Neal is a member. *See* 42 U.S.C. § 1973gg. Therefore, any additional barrier to voting imposed, in this case requiring O'Neal to file a change-of-address form where it would have been unnecessary had DSS followed the law, satisfies any requirement of a concrete injury for purposes of standing.[10]

---

[10] DSS also submitted a signed but undated "declination" by O'Neal. Because the form is undated it does not show that O'Neal, during the relevant period, was offered an opportunity to register to vote and declined it.

16

## C. Preliminary Injunction

In order to prevail on its Motion for Preliminary Injunction, the Plaintiffs must show the following: (1) substantial probability of success at trial; (2) irreparable injury; (3) the harm to Plaintiffs outweigh any possible harm to others; and (4) an injunction serves the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

Plaintiffs have presented substantial evidence that they will ultimately prevail on the merits. Even without the surveys conducted by Miller, ACORN has provided evidence that DSS employees failed to provide voter registration applications to each client who applied for services in person. This failure was due in part to DSS's failure to monitor NVRA compliance and failure to ensure that it could meet the basic, material requirements of supplying local offices with a sufficient number of forms. Indeed, the testimony of Antoinette Brigulio-Mays, one of DSS's eligibility supervisors, indicated that more than a negligible number of eligibility specialists are not offering voter registration forms. (Tr. 197). These are clear violations of the NVRA. *See* 42 U.S.C. § 1973gg-5(a)(4)(A).

The Court concludes that Plaintiffs will be irreparably injured if an injunction does not issue. DSS does not deny that deprivation of the right to vote is irreparable - only that O'Neal has not been so deprived. An injury is irreparable if it cannot be undone through monetary remedies. *Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir. 1987). In this case, no monetary award could compensate O'Neal or other ACORN members for being

17

unable to vote. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004).

DSS argues that its disadvantaged clients will suffer if the Court issues a preliminary or permanent injunction requiring greater compliance with the NVRA. (Tr. 254). However, it is the place of the Missouri legislature to ensure that DSS has sufficient resources to fulfill its legal obligations. DSS cannot fail to offer voter registration services because other services are more important. Nor is the Court persuaded that greater compliance with the NVRA at the preliminary injunction stage would require substantial resources from DSS. Many of the violations cited by Plaintiffs involve little more than following existing DSS policy. For example, Mr. Hall could have contacted local DSS offices on a regular basis to determine whether or not they needed more voter registration forms. DSS's unsubstantiated claims as to resource scarcity do not outweigh the explicit Congressional purpose of removing barriers to voting. This is so even if the wisdom of the NVRA is subject to debate.

Finally, an injunction will serve the public interest by requiring DSS to fulfill its obligations under 42 U.S.C. § 1973gg-5 and Missouri law by extending the opportunity to vote to Missouri citizens in a meaningful way.

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for a Preliminary Injunction [Doc. # 3] is DENIED as to the Jackson County, Kansas City and St. Louis Boards of Election Commissioners.

ORDERED that Plaintiffs' Motion for a Preliminary Injunction is GRANTED as to Defendants Scott and Luck:

(1) DSS is to comply with the requirements of the NVRA.

(2) Within 5 business days, Defendants Scott and Luck will send either an electronic or paper notice to all agency assistant deputy directors, deputy directors, eligibility specialists, eligibility supervisors, program managers and social service managers which includes the following:

The United States District Court for the Western District of Missouri has ordered the Missouri Department of Social Services to comply with the requirements of the National Voter Registration Act, 42 U.S.C. § 1973 and Mo. Rev. Stat. § 115. Failure to comply with this order will subject the Department of Social Services to citation for contempt of court. You are directed that compliance with the NVRA is mandatory. If you have any questions regarding compliance with the NVRA, visit http://www.sos.mo.gov/elections/NVRA_ImplementationGuide.pdf.

(3) Within 30 days, each local DSS office will implement a monitoring system for counting in-person visits and offers of voter registration. This system must be capable of verification by the Court and by the Plaintiffs. Within fifteen days of this order, DSS shall provide to the Court and Plaintiffs a copy of its plan.

(4) Within fifteen days DSS will identify a person in each local office and its main office to be responsible for gathering data about NVRA compliance and enforcement of DSS's stated NVRA policy.

19

Case 2:08-cv-04084-NKL   Document 99   Filed 07/15/08   Page 19 of 20

ORDERED that Plaintiffs' Motion for a Preliminary Injunction is GRANTED as to Defendants Scott and Luck:

(1) DSS is to comply with the requirements of the NVRA.

(2) Within 5 business days, Defendants Scott and Luck will send either an electronic or paper notice to all agency assistant deputy directors, deputy directors, eligibility specialists, eligibility supervisors, program managers and social service managers which includes the following:

The United States District Court for the Western District of Missouri has ordered the Missouri Department of Social Services to comply with the requirements of the National Voter Registration Act, 42 U.S.C. § 1973 and Mo. Rev. Stat. § 115. Failure to comply with this order will subject the Department of Social Services to citation for contempt of court. You are directed that compliance with the NVRA is mandatory. If you have any questions regarding compliance with the NVRA, visit http://www.sos.mo.gov/elections/NVRA_ImplementationGuide.pdf.

(3) Within 30 days, each local DSS office will implement a monitoring system for counting in-person visits and offers of voter registration. This system must be capable of verification by the Court and by the Plaintiffs. Within fifteen days of this order, DSS shall provide to the Court and Plaintiffs a copy of its plan.

(4) Within fifteen days DSS will identify a person in each local office and its main office to be responsible for gathering data about NVRA compliance and enforcement of DSS's stated NVRA policy.

(5) If it comes to the attention of DSS that a client has visited an office and left without being made an offer to register to vote, DSS will contact that client and offer to register that client to vote.

*s/ Nanette K. Laughrey*
NANETTE K. LAUGHREY
United States District Judge

Dated: July 15, 2008
Jefferson City, Missouri